Whaley, Judge,
delivered the opinion of the court:
The plaintiff entered into three contracts with the defendant to furnish a certain number of tons of bituminous coal at stated prices and in accordance with the standard *14 of quality named in the contracts. Two of the contracts required delivery at destination and the third at plaintiffs mines. Upon delivery of the coal the defendant paid the plaintiff 90 percent of the contract price and retained 10 percent until an analysis of the samples was made by the Bureau of Mines. After these analyses were made, the defendant deducted in the aggregate from the amount retained on all three contracts the sum of $1,651.68,. as a penalty for the failure of the coal to come up to the requirements of the contract.
In our view of this case, it is unnecessary to discuss in full detail the contract dated June 24, 1922, order no. C-3352 GS (finding III), for the reason that the facts show the analyses of three of these shipments (on which deductions were made in the amount of $493.30) were so unreasonably delayed that it would be unjust and unfair to the plaintiff to impose a penalty. Heid Bros. v. United States, 65 C.Cls. 87; Heid Bros. v. United States, 69 C.Cls. 704.
All of the contracts hereinafter referred to contained the following provision:
“ If, upon inspection of coal at time of delivery at the camp, post, or station, it is found that coal is of an inferior quality, or has not received careful and thorough preparation, the contracting quartermaster will have the right to penalize the contractor by making payment of only 90 percent of the amount of the invoice, based on the tonnage delivered, at the contract price. The 10 percent withheld is to cover any deduction on account of delivery of coal which, on analysis and test, is subject to an adjustment in price. If the 10 percent withheld should not be sufficient to cover the deduction, then the amount due the United States may be taken from any moneys thereafter to become due to the contractor, and the contractor shall promptly refund any balance. Samples of coal, as delivered from time to time as may be considered desirable, will be collected from one to twenty railway cars at the destination by the quartermaster, and forwarded to the Bureau of Mines, Pittsburgh, Pa., to be analyzed. If the result of these analyses show at any time during the life of the contract 3 percent of moisture above that specified, 2 percent of ash above that specified, or 2 percent of B.t.u. below that specified in the original contract, the contractor will be penalized accordingly. * *
*15 Order no. C-3352-GS, dated June 24, 1922, included one lot of three cars which the analysis showed was excessive in moisture and in ash, for which a deduction of $52.59 was made. The analysis was made within a reasonable time. For reasons which are explaned in connection with the two following contracts, plaintiff is not entitled to recover on the item of $52.59.
Under order no. C-612-JtS, dated October 27, 1922, the plaintiff delivered 44 cars which contained 1,988.99 tons of coal. Although the contract only required samples to be taken from one to twenty cars, the defendant collected samples from nine cars and these samples were forwarded to the Bureau of Mines for analyses and the plaintiff notified of the results within a reasonable time. The plaintiff had contracted that the coal delivered would measure up to the fixed standard, named in the contract, of moisture 6.34%; ash 13.13%, and British thermal units 12,730. The result of the analyses showed the moisture contents to be greater than that mentioned in the contract, including the variation permitted. The British thermal , units were above the requirement (with benefit of variation) and the ash contents were less. These shipments failed to measure up to the fixed standard (that is, the standard without the permitted variation) only in the amount of moisture, and a very slight deficiency in British thermal units in one instance. Moisture does not affect the heat value of coal but it does add to its weight. The defendant reduced the contract price according to the method described in finding VI on all the cars delivered. The plaintiff contends that no penalty should be imposed because the quality of coal delivered, containing less ash and more British thermal units in the aggregate than called for in the contract, overcame the moisture increase and was of a higher grade, with the result that the defendant received a coal of greater heat capacity. We can accept this as true so far as the heat producing quality of the coal is concerned, but in doing SO' we must not lose sight o.f the fact that when coal contains moisture, its weight is increased in proportion to the amount of moisture, and the defendant is paying coal prices for water. In other words, the defendant was receiving less *16 actual coal in each ton delivered than it should have received. The effect and purpose of placing a fixed standard in the contract to which the coal must measure was to protect the defendant from receiving less actual coal weight and heat content, and greater amount of ashes.
There is no allegation that the plaintiff was not fully aware of these requirements. The contract was entered into by it with full knowledge of its conditions and after advertisement of its terms, and the plaintiff’s bid was made in accordance with its conditions. It was incumbent upon the plaintiff to live up to the contract and failure to- do so resulted in the penalty. The penalty imposed was the difference in weight of the coal on all cars, as determined by the agreed method of sampling. We can see no reason not to so apply the penalty.
There is nothing in the contract which permits an adjustment if the plaintiff furnishes a higher grade of coal than provided in the contract. It can receive no benefit under these circumstances. The condition was that the coal delivered should measure up to a certain expressly fixed standard; and when it failed to do so, then the plaintiff' agreed it should suffer a penalty for such failure. There is no good reason why the plaintiff should be relieved from performance of its part of the contract. The amount of reduction applied to this shipment was fair, just, and correct.
Under order no. C-1224 B.S dated January 22, 1923, the plaintiff delivered 95 carloads and samples were taken from 56 cars. The results of the analyses of these samples were reported to the plaintiff within a reasonable time. In the analyses of the samples of 20 cars, the ash contents greatly exceeded and the British thermal units were below the requirements (plus the variation), and as a result the defendant received a greater amount of nonusable matter, and less heat units than specified, and in the other samples the moisture was higher than the standard plus the variation.
What has been said in reference to the second contract applies to this contract. The deductions were made on the delivery price and applied to the entire shipment. We can find no error in this method. The plaintiff contends it *17 should only be penalized, if at all, for the amount beyond the variations named. The contract clearly provides that, should the variation be exceeded, the penalty was to be imposed on the excess over the standard fixed in the contract. A fair reading of the contract leaves little room for doubt on this point.
From what has been said, the plaintiff should recover the deduction made on the first purchase order where the an-alyses were unduly delayed. The other deductions cannot be recovered.
Judgment should be entered for the plaintiff in the sum of $493.30. It is so ordered.
Williams, Judge; Littleton, Judge; and Green, Judge, concur.
Booth:, Chief Justice, took no part in the decision of this case on account of illness.