Williams, Judge,
delivered the opinion of the court:
The plaintiff and the United States entered into a contract, on July 5, 1929, under the terms of which the plaintiff was to deliver to the Alaska Railroad, an agency of the United States, 35,000 tons of coal of 2,000 pounds to the ton, at unit prices as follows: $7.00 per ton for lump nut coal, $3.50 per *759 ton for steam coal, and $3.85 per ton for mine run coal. The guaranteed quality of the coal was, ash content 14 percent, moisture content 9 percent, and British thermal units 11,500 per pound.
The 35,000 tons of coal contracted for were delivered by the plaintiff and accepted by the defendant. During delivery the coal was subjected to the required tests for ash, moisture, and British thermal units content. Some of the coal was found to contain more ash and moisture than the standard fixed in the contract and corresponding deductions were made in the contract price on that account. These deductions are not in controversy. On the other hand the coal was found to contain an excess of British thermal units per pound over the standard of 11,500 specified in the contract. Monthly payments at the contract price were made to the plaintiff as the coal was delivered, less deductions on account of the excess ash and moisture content. No extra payment or bonus was made because of the increased heat value of the coal arising from the excess British thermal units per pound over the standard requirement of the contract, but the Alaska Railroad in its statements to plaintiff from month to month made a computation of the increased heat value of the coal on that account, and upon the completion of the contract issued a voucher to plaintiff covering the total amount of such increase in the sum of $8,915.28, subject to the interpretations of the contract by the Comptroller General. The Comptroller General disallowed the payment of the voucher, hence this suit.
Paragraph 7 of the specifications provides:
“7. The railroad will pay per ton of 2,000 lbs. of coal delivered and accepted in accordance with the terms of the contract, as soon after the first of each month as the account can be conveniently balanced, the price per unit herein named; said price to be adjusted according to variations in ash content, B. t. u.’s and moisture, from standards specified by the contractor. * *
The plaintiff contends that the word “ adjusted ” contemplates and means the revision of the unit contract price either up or down, as the quality of the coal delivered exceeds or falls short of the standard specified in the contract as to ash *760 content, British thermal units, and moisture. In other words, the plaintiff construes the contract to mean that plaintiff is to be penalized if the quality of the coal delivered fails to meet the standard prescribed, and that it is entitled to an increased price or a bonus if the coal exceeds in quality the standard fixed.
Paragraph 7, in our opinion, cannot be given this interpretation when it is considered in connection with other provisions of the specifications. Paragraph 4 provides that the railroad may, at its option, either accept or reject deliveries of coal showing by analysis moisture or ash content two percent or more higher, or British thermal units two percent or more lower than specified in the proposal. Paragraph 8 provides that no adjustment in bid price shall be made on account of the ash content unless the percentage is two percent or more higher than the ash content guaranteed, and an arbitrary rule is laid down to determine the amount of the deduction. The specification is silent as to an adjustment in price in case the ash content is less than the standard prescribed. Paragraph 9 provides for an adjustment of the contract price for moisture in excess of the amount specified, and also lays down the rule for determining the amount of the deduction. There is no provision for an adjustment in contract price in case the moisture content is less than the 9 percent specified in the contract. Paragraph 11 provides that if the coal, on visual inspection, appears to be acceptable coal, the railroad shall have the right to make payment on 90 percent of the tonnage delivered at the bid price per ton, the 10 percent being withheld to cover any deduction on account of delivery of coal which on analysis and test is found subject to a downward revision in price. It seems clear that when paragraph 7 of the specifications upon which plaintiff relies is considered in connection with paragraphs 4, 8, 9, and 11, it cannot be construed to mean that if plaintiff furnished coal containing less ash and moisture than guaranteed, or coal that contained more British thermal units per pound than that stipulated, an upward adjustment or revision of the unit contract price would be made and that plaintiff would be paid a price per ton in excess of the amount agreed upon in the contract.
*761 The contract required the plaintiff to furnish coal of a certain standard quality as to ash and moisture content and British thermal units per pound. If the coal delivered fell short of the standard specified, the railroad company was given the option of either accepting or rejecting the same. If it elected to accept the coal it did so at the adjusted or .reduced price stipulated. There is nothing in the contract .that permits an upward adjustment of the contract price in case the plaintiff furnished a higher grade of coal than required. Pittsburgh & Midway Coal Mining Co. v. United States, 77 C. Cls. 8.
The plaintiff is not entitled to recover and the petition is hereby dismissed. It is so ordered.
Whaley, Judge; LittletoN, Judge; GeeeN, Judge; and Booth, Chief Justice, concur.